IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

CHRISTINA D. SIKES                                                    PLAINTIFF

v.                          Civil No. 2:20-cv-02071-PKH-MEF

KILOLO KIJAKAZI, Acting Commissioner,[1]
Social Security Administration                                       DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Christina D. Sikes, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration ("Commissioner") denying her claims for a period of disability, disability insurance benefits ("DIB"), and supplemental security income ("SSI") benefits under Titles II and XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision.  42 U.S.C. § 405(g).

## I.      Procedural Background

Plaintiff filed her applications for benefits on September 20, 2016, alleging disability beginning April 11, 2016, due to various medical conditions precipitated by an accident.  (ECF No. 15-3, p. 69; No. 15-6, p. 265).  Plaintiff was 42 years old on the date she filed her applications, had a high school education, and was unable to perform any past relevant work.  (ECF No. 15-2, p. 25).  The Commissioner denied her applications initially and on reconsideration.  (*Id*., p. 11).

---

[1] Kilolo Kijakazi became Acting Commissioner of the Social Security Administration on July 9, 2021.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted as the defendant in this suit.  No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

At the Plaintiff's request, an Administrative Law Judge ("ALJ") held an administrative hearing on February 21, 2019.  (*Id.*, pp. 11, 35-66).  Plaintiff was present and represented by counsel.  (*Id.*, pp. 11, 38).  At the hearing, Plaintiff amended her alleged onset date to September 8, 2016.  (*Id.*, pp. 11, 39).

On April 18, 2019, the ALJ concluded that Plaintiff's traumatic brain injury, closed fracture of zygomatic arch, orbital fractures and fracture of frontal bone, degenerative disc disease, obesity, osteoarthritis, dizziness, cognitive deficits due to head injury, personality change due to head injury, and depression due to head injury were severe, but then concluded they did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.  (ECF No. 15-2, pp. 13-15).  He found Plaintiff capable of performing sedentary work, except that she can occasionally climb ramps and stairs and never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch or crawl; work where interpersonal contact is only incidental to the work performed, e.g., assembly work, where complexity of tasks is learned and performed by rote with few variables and little judgment; and where required supervision is simple, direct, and concrete.  (*Id.*, pp. 15-25).  With the assistance of a vocational expert ("VE"), the ALJ concluded that Plaintiff could perform work as an addressing clerk.  (*Id.*, pp. 25-26).

The Appeals Council denied Plaintiff's request for review on March 2, 2020.  (ECF No. 15-2, pp. 1-5).  Plaintiff then filed this action.  (ECF No. 1).  This matter is before the undersigned for report and recommendation.  Both parties have filed appeal briefs (ECF Nos. 18, 19), and the case is ready for decision.

## II.    Relevant Evidence

The undersigned has conducted a thorough review of the entire record in this case.  Because Plaintiff's appeal concerns the need for an updated consultative mental diagnostic evaluation,

additional severe impairments, and additional limitations in the RFC and hypothetical posed to the VE, the undersigned will only recount evidence relevant to Plaintiff's claims.

Prior to the alleged onset date of September 8, 2016, Plaintiff underwent bilateral carpal tunnel release procedures in 2011 and 2014. (ECF No. 15-10, p. 109; ECF No. 15-12, p. 79). In 2015, she was treated for lumbar strain. (ECF No. 15-10, p. 45). In April 2016, the company for which Plaintiff worked completed a merger, her position was removed, and she stopped working. (ECF No. 15-6, p. 6).

In September 2016, Plaintiff was admitted for treatment following an ATV accident during which she sustained acute respiratory failure following trauma and surgery; a closed fracture of the zygomatic arch; an orbit fracture, right, closed; and a closed fracture of the frontal bone. (ECF No. 15-7, pp. 1-22; ECF No. 15-8, pp. 1-137; ECF No. 15-9, pp. 1-138). Following eight days in the hospital, Plaintiff was discharged in good condition, ambulating independently, able to converse and make reasonable simple decisions, and able to identify her location. (*Id.*). It was noted that Plaintiff still had deficits from post-traumatic brain injury (TBI), including inability to recall the current month, but she could be discharged to her family who stated that they would provide 24/7 care for her. (*Id.*). During her follow-up, Plaintiff reported that her headaches were improving and that she was able to work in the garden. Her clinical progress was improved, her ambulation was improving, the fractures to her right orbit were doing well, and her remaining neck and shoulder soreness were consistent with her recent injury. (*Id.*). She reported some forgetfulness, trouble completing sentences, and mild agitation. Plaintiff was advised to get plenty of rest and refrain from lifting, pulling, tugging, or pushing. (*Id.*).

From October to December 2016, Plaintiff complained of dizziness and neck, back, and elbow pain. (ECF No. 15-9, pp. 120-38; ECF No. 15-10, pp. 1-9). A CT brain scan showed that

the subarachnoid and subdural hemorrhage appeared to have resolved or become isodense.  (ECF No. 15-9, p. 114).  Spine x-rays showed minimal degenerative anterior marginal spondylosis at multiple levels of the thoracic spine, no acute bony abnormality of the cervical spine, no skull abnormality, no paranasal sinus inflammatory disease, and negative findings of the elbow.  (ECF No. 15-10, pp. 131-142).  Plaintiff reported improved dizziness, but remaining neck and upper extremity pain, low back pain, pressure in the right eye, and mild tenderness with limited range of motion of the right elbow.  (*Id*., p. 20).  Lumbar and cervical MRIs showed disc bulging at the L4-5 and L5-S1 levels without any significant canal stenosis and a normal cervical spine.  (*Id*., pp. 6, 8).  She was given a right shoulder brace and advised to take it easy.  (*Id*., p. 20).

Also, in October 2016, Plaintiff completed a function report explaining that her ability to work was limited by a severe brain trauma that had caused lasting physical and mental impairments, including dizziness and pain.  (ECF No. 15-6, pp. 14-21).  She reported dizziness that caused her to fall, and neck, back, and head pain that limited her ability to lift, walk, climb stairs, kneel, squat, and bend.  Dizziness prevented her from shaving her legs, doing housework and yardwork, and driving.  Otherwise, she independently completed personal care, regularly visited her mother two miles away, attended doctor appointments, prepared her own meals weekly, and could walk 100 yards before stopping to rest for 10 minutes.  (*Id*.).  She had some problems falling asleep, but she reported the ability to pay attention for 30 minutes, follow written instructions well, and follow short, spoken instructions well.  She got along with authority figures very well, though pain and fatigue caused by the TBI had shortened her patience.  Additionally, she reported that the TBI had altered her ability to handle stress and changes of routine well.  She could no longer finish what she started, and she reported heightened anxiety that she or her family might be hurt.  (*Id*.).

Plaintiff also completed a pain questionnaire in October 2016 in which she stated that all her problems stem from her ATV accident in September 2016. (ECF No. 15-6, pp. 14-21). She described constant neck and upper back pain worsened by walking, standing, and, to a lesser extent, sitting. Her pain was relieved by relaxing or lying down, but she also reported forgetfulness, pressure in her forehead, and pain behind her right eye all due to head trauma. (*Id.*).

In 2017, Plaintiff sought treatment for anxiety and depression with complaints of memory loss and trouble focusing. (ECF No. 15-10, pp. 19, 39). She reported to her advanced practice nurse ("APN") that she was okay, but the anxiety and depressive mood were getting to her. (*Id.*, p. 19). Following three weeks on an antidepressant, Plaintiff reported that she found it effective, and the treating APN noted that Plaintiff's anxiety seemed better. (*Id.*, p. 18). She exhibited a constricted affect with an anxious, depressed, and irritable mood. (ECF No. 15-12, p. 73). The treating licensed psychological examiner at The Guidance Center diagnosed Plaintiff with major depressive disorder ("MDD"), panic disorder, and post-traumatic stress disorder ("PTSD"). (*Id.* at p. 76). In addition, she complained of balance problems and back pain. (ECF No. 15-10, p. 39). Her neck pain was reportedly alleviated, however, though not eliminated, by her prescribed pain medication. (*Id.*, p. 19). Given the "rather benign" findings of neck and low back imaging, the treating physician assessed that stress was likely the cause of Plaintiff's lingering pain. (*Id.*, p. 39).

In March 2017, Plaintiff completed a function report in which she asserted that her ability to work was limited due to fatigue, constant neck and back pain, anxiety, and problems with focus and memory that manifested as difficulty with conversation. (ECF No. 15-6, pp. 46-49). She could prepare simple meals, do laundry and dishes, feed animals, sweep, and drive and ride in a car independently within 20 miles. However, she required reminders to complete tasks, including

completing household chores, taking medication, bathing, and brushing her teeth. She could shop in stores for groceries three times a month for 30 minutes. (*Id*.). She reported that she took care of her daughter by feeding her, taking her to and from school, playing board games with her, and helping her with schoolwork. She did not socialize outside the home due to social anxiety and preferred that her wife accompany her out. She reported that she could pay attention for variable amounts of time depending on the tasks and number of distractions present, she could follow written instructions and short, spoken instructions well, and she could get along with authority figures well. (*Id*.).

Plaintiff's wife also completed a third-party function report largely reiterating Plaintiff's limitations in daily functioning. (ECF No. 15-6, pp. 29-38). She described Plaintiff's severe anxiety, personality changes, and lack of physical stamina since the ATV accident. Though Plaintiff could take their daughter to and from school and help with meals, she left a lot of housework unfinished and needed to take several breaks when feeding the animals. Though she did not have problems getting along with others, Plaintiff limited social activities due to trouble finding words during conversations, which increased her anxiety. She also had problems understanding intended meanings during conversations such that she took things the wrong way and became very emotional. She also took longer to complete grocery shopping independently as she would forget what she was shopping for if she were alone. (*Id*.).

Additionally, in March 2017, Plaintiff submitted a pain questionnaire describing constant back and neck pain accompanied by pressure headaches, jaw and tooth pain, and blurry vision. (ECF No. 15-6, pp. 44-45). She explained that, though she was not physically active apart from walking, even mental activity worsened her headaches. While rest and hot showers alleviated her

physical pain, the anxiety precipitated by her TBI caused confusion, inability to focus, and difficulty finding words in conversations. (*Id*.).

Also, in 2017, the DDS physicians reviewed the available medical evidence initially and upon reconsideration. (ECF No. 15-10, p. 30; ECF No. 15-3, pp. 14, 18, 61, 58). It was ultimately assessed that Plaintiff was capable of sedentary work where interpersonal contact is only incidental to work performed, complexity of tasks is learned, and supervision is simple, direct, and concrete, i.e., unskilled. (ECF No. 15-3, pp. 58, 61).

In July 2017, mental consultative examiner, Dr. Patricia Walz, Ph.D., examined Plaintiff and reviewed her medical record showing treatment for anxiety and depression, assessment of an adjustment disorder with anxiety and prolonged depressed mood, and a prescription for anti-depressants since February 2017. (ECF No. 15-10, p. 30-36). Plaintiff reported that she was independent in her daily activities, though she did not shave her legs due to pain and instability on her feet and she occasionally needed reminders to bathe. She had a brace for tennis elbow but was not wearing it during the evaluation. She reported that she could not multi-task well and did not do much around the house, though she occasionally cooked one-pot meals. Though she reported constantly poor energy levels, her sleep was improved, and she was walking for exercise. Plaintiff could drive, do artwork, play with her daughter, feed her animals, and go to the store or her mother's house several times a week. Plaintiff told Dr. Walz that she found it aggravating and anxiety inducing when she could not find words during conversations. (*Id*.).

Dr. Walz conducted a mental status exam, which showed some pain behavior, a sad mood and affect, and word searching. (ECF No. 15-10, pp. 30-36). Dr. Walz assessed Plaintiff with average intellectual functioning and diagnosed her with mild neurocognitive disorder due to TBI and depressive disorder due to TBI. Her "social skills would be impaired by her mild expressive

language disorder and her social anxiety," and her speech was notable for word searching. Though Plaintiff reported problems with memory, her attention and concentration were noted to be fair. Dr. Walz found that Plaintiff would be easily frustrated and would likely quit tasks impulsively when anxious or frustrated. Though Dr. Walz assessed Plaintiff with average intellectual functioning, Plaintiff's speed of information processing was slow. (*Id*.).

In October 2017, Plaintiff submitted an additional function report mainly asserting that her ability to work was limited due to anxiety, depression, and inability to focus, all precipitated by a TBI. (ECF No. 15-6, pp. 69-76). She reported that she could perform physical activities but required four days to recover, and extreme temperatures also caused fatigue. She still had high anxiety, which was aggravated by cooking, handling finances, doing housework and yardwork alone, going out, and spending time with others. She could still dress independently, get her daughter ready for school, and take her daughter to school. Though she required reminders to complete tasks, take medication, and bathe, she could drive locally and, with help, could shop in stores for groceries about once a month. She socialized with others over dinner once a week, regularly attended church, and helped with household chores. (*Id*.).

In an additional pain questionnaire, Plaintiff asserted that she experienced constant pain in her neck, head, and back that occurred immediately upon standing, walking, or sitting. (ECF No. 15-6, pp. 67-68). She reported problems with focusing, anxiety, and depression. (*Id*.).

Plaintiff continued to report anxiety, depression, dizziness, and problems with memory and focus in 2018. (ECF No. 15-10, pp. 86, 112, 115, 121; ECF No. 15-11, p. 33; ECF No. 15-12, pp. 69, 81, 90). She was also treated for an ankle sprain following a fall, and an x-ray showed swelling and calcaneal spurs but no fracture. (ECF No. 15-10, p. 129). A CT of the head showed no radiographic abnormalities, and Plaintiff reported that medication helped her dizziness a great deal,

though she would be incapacitated by dizziness without the medication.  She also continued medication for her neck and shoulder pain.  (*Id*. at p. 112).  Though no evidence of a fracture or other bone or joint abnormality was found, Plaintiff received bilateral wrist splints to treat marked tenderness at the lateral epicondylitis in bilateral elbows.  (*Id*.).

In April 2018, Plaintiff was admitted for viral meningitis, and her discharge diagnoses included viral meningitis HSV2 positive, hypothyroidism, depression, and negative brain MRI for any acute abnormality.  (ECF No. 15-12, p. 95).  During her three-week follow-up appointment, the treating APN assessed Plaintiff with benign recurrent meningitis, or Mollaret's syndrome, and Plaintiff reported that she was doing "okay," albeit fatigued.  (ECF No. 15-11, p. 48).  By May, Plaintiff reported that her dizziness was "okay," but memory loss and lack of focus continued. (ECF No. 15-10, p. 115)  She reported that muscle spasm medication helped somewhat with joint and muscle pain.  (ECF No. 15-11, p. 72).

In October 2018, Dr. Kleiner, Ph.D., conducted a neuropsychological assessment of Plaintiff.  (ECF No. 15-10, p. 78-85).  While Plaintiff reported being independent for all activities of daily living, she explained that she needed reminders to take medications and did not manage any household finances.  She could drive but was limited to local destinations as navigation even to familiar locations was difficult for her to remember.  She reported that cooking was too stressful for her as she could not prepare more than one thing at a time.  Based on testing, Dr. Kleiner observed that Plaintiff frequently required questions repeated, but she exhibited no word finding difficulties in conversational speech or paraphasic errors.  Plaintiff could ambulate slowly but independently.  Her self-reported mood was depressed and anxious, and her affective presentation was consistent with her mood.  (*Id*.).  Dr. Kleiner observed that Plaintiff had normal social interactions without difficulty comprehending test instructions or normal conversation.  Though

she fatigued over the course of the examination, she was able to persist and self-correct recognized errors.  (*Id*.).

Dr. Kleiner's impression was that Plaintiff demonstrated residual areas of mild cognitive weakness involving processing speed, visual encoding, first trial unstructured verbal encoding, and dual attention in the contexts of an otherwise intact neuropsychological profile.  (ECF No. 15-10, pp. 78-85).  Dr. Kleiner attributed these areas of weakness to Plaintiff's head injury, possibly worsened by meningitis.  She noted that Plaintiff's mood and anxiety symptoms likely played a significant role in the variability in her daily cognitive functioning.  (*Id*.).  Based on diagnoses of cognitive deficits, personality change, and depression, all due to a traumatic head injury, Dr. Kleiner recommended Plaintiff engage in multidisciplinary treatment for depression and anxiety, undergo a medication evaluation from a psychiatrist, reengage in psychotherapy, and engage in regular physical exercise that would help support cognition and mood.  (*Id*.).

In October 2018, Plaintiff's treating neurologist recommended that Plaintiff's anxiety and depressive symptoms would be better managed by a psychiatrist, who would take over her medications.  (ECF No. 15-10, p. 121).  As to her physical concerns, Plaintiff reported to her treating APN that she was doing okay, though she aggravated her back while gardening.  (ECF No. 15-12, p. 43).  She declined an x-ray and reported that she only took her pain medication as needed as it worked well for her neck and back pain.  (*Id*.).  As to her mental health treatment, Plaintiff's status exam with Stonehaven Behavioral Health and Wellness revealed an anxious and depressed mood with a sad, anxious, and worried affect.  (ECF No. 15-10, p. 86).  She was diagnosed with generalized anxiety disorder ("GAD"), panic disorder, severe MDD, and PTSD. (*Id*.).

In 2019, Dr. Atchley, Ph.D., conducted a mental RFC assessment of Plaintiff, in which he opined that Plaintiff would have great difficulty holding a job due to diagnoses of PTSD, severe MDD, GAD, and panic disorder.  (ECF No. 15-13, p. 41).  Dr. Atchley noted Plaintiff's symptoms such as fearfulness, worry, frequent crying, constant agitation/irritability, obsessive thoughts, low self-esteem, no interest in life, difficulty with decision making, difficulty concentrating, inability to remember simple instructions, and difficulty interacting with others.  (*Id.*).  Dr. Atchley also noted symptoms of dizziness, heart racing, unsteady stance and gait, difficulty breathing, lack of energy, difficulty sleeping, muscle tension, headaches, and constant pain rated at seven or eight. (*Id.*).

Finally, in 2019, Plaintiff's treating APN Revis conducted a physical RFC assessment, in which she and Dr. Bennett stated that Plaintiff would only be able to work part time, specifically less than 10 hours per week regardless of work restrictions.  (ECF No. 15-13, p. 42).  They opined that Plaintiff had some physical limitations but was more hindered by cognitive deficits due to a traumatic brain injury in September 2016, including very poor short-term memory and recall, decreased concentration, inability to complete tasks in a timely manner, and being easily confused and distracted.  They concluded that Plaintiff would not be able to function in a work environment productively and some environments would hinder her health.  *(Id.).*

### III.    Applicable Law

This Court's role is to determine whether substantial evidence supports the Commissioner's findings.  *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010).  Substantial evidence is less than a preponderance but enough that a reasonable mind would find it adequate to support the Commissioner's decision.  *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019).  We must affirm the ALJ's decision if the record contains substantial evidence to support it.  *Blackburn v.*

11

*Colvin*, 761 F.3d 853, 858 (8th Cir. 2014). If there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. *Id*.

A claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D). A Plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The fact finder only considers Plaintiff's age, education, and work experience in the light of her residual

functional capacity if the final stage of the analysis is reached.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

## IV.    Discussion

Plaintiff raises four issues on appeal: (1) whether the ALJ erred by not ordering an updated consultative mental diagnostic evaluation; (2) whether the ALJ properly considered all of Plaintiff's severe impairments at Step Two; (3) whether the ALJ erred when assessing Plaintiff's residual functional capacity ("RFC"); and (4) whether the ALJ made a proper Step Five determination.  After thoroughly reviewing the record, the undersigned finds that the ALJ's decision to deny benefits is supported by substantial evidence.

### A.    Fully and Fairly Developed Record

In her first issue, Plaintiff contends that the ALJ failed to fully and fairly develop the record because he did not order an updated consultative mental diagnostic evaluation.  (ECF No. 18, pp. 8-10).  The ALJ owes a duty to a claimant to develop the record fully and fairly to ensure his decision is an informed decision based on sufficient facts.  *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).  However, the ALJ is not required to function as the claimant's substitute counsel, but only to develop a reasonably complete record.  *Whitman v. Colvin*, 762 F.3d 701, 707 (8th Cir. 2014) (quoting *Clark v. Shalala*, 28 F.3d 828, 830-31 (8th Cir. 1994)).  While "[a]n ALJ should recontact a treating or consulting physician if a critical issue is undeveloped," "the ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled."  *Johnson v. Astrue*, 627 F.3d 316, 320 (8th Cir. 2010) (quotation, alteration, and citation omitted).

Here, the medical records available to the ALJ gave him sufficient medical evidence to determine whether Plaintiff was disabled, and, therefore, the ALJ was not required to order an

13

updated consultative mental diagnostic evaluation.  Treatment records, diagnostic evaluations, physical examinations, function reports, and hearing testimony provided an adequate basis to determine the extent and limiting effects of Plaintiff's traumatic brain injury issues.

As to the objective medical evidence, the ALJ considered the substantial treatment record detailing Plaintiff's history of bilateral carpal tunnel releases, hospitalization and numerous follow-up appointments for injuries sustained from an ATV accident, hospitalization for meningitis, as well as mental health treatment.  (ECF No. 15-2, pp. 17-21).  The ALJ noted that physical examinations revealed relatively normal findings, medications appeared to control pain, and anti-depressant medication helped control mood.  (*Id.*, p. 21).  Indeed, treatment notes during Plaintiff's recovery following the ATV accident show clinical improvement, normal to mild radiographic findings, and lingering but improving pain.  (ECF No. 15-9, pp. 86, 114, 124).

The ALJ noted that Plaintiff's mental health treatment was spotty, but medications appeared effective.  (ECF No. 15-2, p. 21).  Plaintiff complained of anxiety and depression following her ATV accident.  (ECF No. 15-10, pp. 18-19).  After starting an anti-depressant, Plaintiff reported that she found it effective in controlling her symptoms, and the treating APN noted that her anxiety had improved.  (*Id.*).  Dr. Davis, treating neurologist, diagnosed cognitive deficits due to a head injury, but suggested that psychiatry would better manage Plaintiff's anxiety and depressive symptoms.  (*Id.*, p. 121).  Therapy notes from Stonehaven Behavioral Health and Wellness showed treatment for GAD, panic disorder, severe MDD, and PTSD.  (*Id.*, p. 86; ECF No. 15-13, p. 47).

As to the opinion evidence regarding Plaintiff's cognition, the ALJ's decision shows that he considered and afforded great weight to the opinions of two consultative examining physicians and state agency physicians.  (ECF No. 15-2, pp. 23-25).  The ALJ noted that a neuropsychological

14

evaluation did not indicate that Plaintiff could not work, though mild cognitive issues remained. (*Id.*, p. 21).

He considered the neuropsychological examination and report provided by Dr. Kleiner, who examined Plaintiff and reviewed her imaging studies and medical records. (ECF No. 15-2, p. 25). In particular, the ALJ gave some weight to Dr. Kleiner's observation that Plaintiff had residual areas of mild cognitive weakness due to the head trauma and meningitis. (*Id.*). During the neuropsychological assessment by Dr. Kleiner, Plaintiff exhibited no word finding difficulties in conversational speech, though she frequently required questions repeated. (ECF No. 15-10, pp. 78-85). Her affective presentation was consistent with her self-reported depressed and anxious mood, and she exhibited normal social interactions without difficulty comprehending test instructions or normal conversation. Dr. Kleiner noted that Plaintiff persisted and self-corrected recognized errors, though she fatigued over the course of the examination. (*Id.*).

As to the opinion of Dr. Walz, the ALJ noted that Dr. Walz examined the Plaintiff and reviewed her medical records. (ECF No. 15-2, p. 23). The ALJ further found that Dr. Walz's opinion was consistent with the objective medical evidence of record and, consequently, afforded Dr. Walz's findings great weight. (*Id.*). The mental status exam showed a sad mood and word searching, and Dr. Walz assessed Plaintiff with average intellectual functioning. (ECF No. 15-10, pp. 30-36). Dr. Walz diagnosed Plaintiff with mild neurocognitive disorder and depressive disorder, both due to TBI. Dr. Walz opined that Plaintiff's mild expressive language disorder and social anxiety would impair her social skills and her anxiety and easy frustration would likely cause her to quit tasks impulsively. (*Id.*). Though her speed of information processing was slow, Plaintiff's attention and concentration were fair. (*Id.*).

The ALJ also considered the opinions of the state agency physicians and gave them great

weight based on the physicians' expertise in the assessment of functionality under the Act and because they provided specific support for their assessments upon review of Plaintiff's medical record. (*Id*.). The state agency physicians reviewed the mental status consultative examinations, function reports, and primary care provider treatment notes to conclude that Plaintiff retained the capacity to do simple, repetitive, 1-2 step tasks with limited public or interpersonal contact. (ECF No. 15-3, p. 86). Upon reconsideration, it was noted that the submitted neurological exam predated the mental status consultative examination. Additionally, it was noted that the mental status consultative examination was the substantial mental medical evidence of record. (*Id*.).

Thus, despite Plaintiff's allegation that her limitations based on cognitive deficits and symptoms of mental impairments required an additional consultative examination, we do not find that the record was inadequate for the ALJ to make his determination. Plaintiff did not receive formal mental health treatment until late 2017, presumably due to the successful control of her symptoms with anti-depressants starting in early 2017, and later failed to keep her neuropsychological appointment in late 2018. Further, the report of the consultative examiner provided diagnoses and assessments based on an in-person examination and testing of Plaintiff, as well as a review of Plaintiff's medical record. We cannot say that the record available to the ALJ was inadequate such that he would be required to order additional assessments. Thus, we find that the ALJ fully and fairly developed the record.

## B.  Severe Impairments

In her second issue, Plaintiff contends that the ALJ erred by failing to find additional medically determinable severe impairments, namely GAD, panic disorder, PTSD, and post-operative carpal tunnel syndrome. (ECF No. 18, pp. 11-12). At Step Two, a claimant has the burden of providing evidence of functional limitations in support of her contention of disability.

16

*Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Id*. (citing *Bowen v. Yuckert*, 482 U.S. 137, 153 (1987); 20 C.F.R. § 404.1521(a)). "If the impairment would have no more than a minimal effect on the claimant's ability to work, then it does not satisfy the requirement of Step Two." *Id*. (citing *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007)). Once an ALJ finds that a claimant has a severe impairment at Step Two, the ALJ must consider all medically determinable impairments, including those not severe, in assessing a claimant's residual functional capacity. 20 C.F.R. §§ 404.1545(e), 416.945(e); Social Security Ruling (SSR) 96-8p, at *5.

Here, the ALJ found that Plaintiff had severe impairments of traumatic brain injury, closed fracture of zygomatic arch, orbital fracture and fracture of frontal bone, degenerative disc disease, obesity, osteoarthritis, dizziness, cognitive deficits due to head injury, personality change due to head injury, and depression due to head injury. (ECF No. 15-2, pp. 14-15). In his decision, the ALJ proceeded in the sequential analysis and considered all of Plaintiff's impairments, including those less than "severe," to determine the RFC. (*Id*., pp. 14-26).

In particular, the ALJ considered treatment records showing assessments for MDD, panic disorder, and PTSD. (ECF No. 15-2, p. 18). He further considered Plaintiff's statements that she was not depressed or anxious until the accident, but that her anxiety had improved since seeing a counselor for her PTSD and starting anti-depressants prescribed by her primary care physician. (*Id*., pp. 18-19). The ALJ considered additional mental status exams that found depression due to head injury, GAD, panic disorder, and PTSD, as well as counseling notes from 2019 in which Plaintiff reported flashbacks of trauma, rapid thinking, and inefficacy of medication. (*Id*., pp. 20-22). However, the ALJ also considered Plaintiff's function reports, pain questionnaires, and

statements to treatment providers indicating that she was largely independent in personal care and responsible for taking her daughter to and from school, that she helped with housework and yardwork, drove locally, went grocery shopping in stores, prepared meals, and socialized weekly. (*Id.*).  Plaintiff consistently asserted that her cognitive deficits and mental health impairments were precipitated by her TBI.  (ECF No. 15-6, pp. 69-76).  Further, opinion evidence from examining physicians attributed Plaintiff's cognitive deficits and major depression to her TBI and observed that Plaintiff had fair attention and concentration as well as average intellectual functioning, despite word-searching speech and social anxiety.  (ECF No. 15-10, pp. 30-36, 78-85).

Finally, the ALJ considered treatment records showing Plaintiff's history of bilateral carpal tunnel releases prior to Plaintiff's alleged onset date.  (ECF No. 15-2, p. 18).  However, Plaintiff did not allege disability, and the evidence of record does not indicate work-related limitations, due to post-operative carpal tunnel syndrome.  Thus, based on the objective medical evidence, opinion evidence, and Plaintiff's own reports of her limitations, we find that the ALJ properly considered the medically determinable impairments, including those not severe, in assessing Plaintiff's RFC, and we cannot say that consideration of these additional impairments as severe at Step Two would have affected the disability determination.  Thus, we find substantial evidence to support that the ALJ properly determined Plaintiff's severe impairments.

### C.  RFC Finding

In her third issue, Plaintiff contends that the ALJ erred in his RFC determination by failing to include specific social restrictions based on her GAD, panic disorder, and PTSD.  The RFC is the most a person can do despite that person's limitations.  20 C.F.R. §§ 404.1545, 416.945.  A disability claimant has the burden of establishing her RFC.  *Vossen v. Astrue,* 612 F. 3d 1011, 1016 (8th Cir. 2010).  "The ALJ determines a claimant's RFC based on all relevant evidence in the

record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of her limitations." *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010); *Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Miller v. Colvin*, 784 F.3d 472, 479 (8th Cir. 2015) (citing *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. *Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012).

Here, the ALJ considered the treatment record, opinion evidence, and Plaintiff's statements regarding her functionality to determine the RFC as follows, in relevant part: "She is able to perform work where interpersonal contact is only incidental to the work performed, e.g., assembly work, complexity of tasks is learned and performed by rote with few variables and little judgment and required supervision is simple, direct, and concrete." (ECF No. 15-2, pp. 16-26). Plaintiff asserts that medical source statements by Dr. Atchley, Ph.D., and APN Revis, support additional social restrictions that should have been included in the ALJ's RFC finding, and that the ALJ improperly discounted these opinions. (ECF No. 18, pp. 12-17).

"The Commissioner may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence." *Thomas v. Berryhill*, 881 F.3d 672, 675 (8th Cir. 2018) (quotations and citations omitted). "[A] 'treating physician's opinion deserves no greater respect than any other physician's opinion when the treating physician's opinion consists of nothing more than vague, conclusory statements.'" *Kraus v. Saul*, 988 F.3d 1019, 1026 (8th Cir. 2021) (citations omitted).

19

Given the objective medical and other evidence of record, Plaintiff certainly suffers from cognitive deficits and mental health limitations. In 2017, Plaintiff's treatment records show that she endorsed anxiety, depression, and memory and focus issues. (ECF No. 15-10, pp. 19, 39). She exhibited a constricted affect with an anxious, depressed, and irritable mood. (ECF No. 15-12, p. 73). The treating licensed psychological examiner at The Guidance Center diagnosed Plaintiff with major depressive disorder, panic disorder, and PTSD. (*Id*., p. 76). Plaintiff also reported to APN Revis, however, that the anti-depressant medication was effective, and APN Revis noted that Plaintiff's anxiety had improved. (ECF No. 15-10, p. 18).

In October 2018, Plaintiff's treating neurologist adjusted Plaintiff's anti-depressants (ECF No. 15-10, p. 121), and Plaintiff's mental evaluation with Stonehaven Behavioral Health that same month revealed no problems getting along with others, normal attention and concentration, intact and normal insight and judgment, and normal thought content and process (*Id*., pp. 101-02). Plaintiff still exhibited an impaired memory and an anxious and depressed mood. (*Id*.).

In July 2017, during Dr. Walz's mental consultative exam, Plaintiff reported that she could not multi-task well, occasionally needed reminders to bathe, and became aggravated and anxious when she could not find words during conversations. (ECF No. 15-10, pp. 30-36). She also reported that she could drive, do artwork, play board games with her daughter, feed her animals, go grocery shopping regularly, and visit her mother's house several times a week. Dr. Walz examined Plaintiff, reviewed her medical record, and diagnosed her with mild neurocognitive disorder and depressive disorder due to TBI. (*Id*.). Dr. Walz opined that Plaintiff would be easily frustrated and likely quit tasks impulsively when anxious or frustrated, that her social skills would be impaired by mild expressive language disorder and social anxiety, and that her speed of information processing was slow. However, Dr. Walz also opined that Plaintiff's attention and

concentration were fair and she had average intellectual functioning. (*Id.*).

In October 2018, Dr. Kleiner's exam showed that Plaintiff had generally mild and isolated areas of weakness in processing speed, visual encoding, first trial unstructured verbal encoding, and dual attention in an otherwise intact neuropsychological profile. (ECF No. 15-10, pp. 78-85). Plaintiff frequently needed questions repeated and presented with a depressed and anxious affect congruent with her mood, which Dr. Kleiner noted likely played a significant role in the variability in her daily cognitive functioning. She fatigued over the course of the exam, but Dr. Kleiner noted that she was able to persist, self-correct recognized errors, and exhibited no word finding difficulties. Further, Dr. Kleiner observed that Plaintiff had no difficulty comprehending test instructions or normal conversation. She reported being generally independent for all activities of daily living but required reminders to take medications. Dr. Kleiner recommended multidisciplinary treatment for depression and anxiety, medication evaluation from a psychiatrist, psychotherapy, and regular exercise. (*Id.*).

In her function reports, Plaintiff described generally independent personal care. (ECF No. 15-6, pp. 14-21, 29-38, 46-49). She had some ability to drive locally despite anxiety and forgetfulness; she could prepare simple meals and help with housework, yardwork, animal care, and childcare. She stated that she could no longer finish what she started or handle stress or changes in routine as well as she used to before her TBI. As to social interactions, she attended doctor appointments regularly, visited her mother several times a week, attended church weekly, and socialized over dinner and on walks. She reported no problems getting along with others, though she endorsed shortened patience and social anxiety due to problems with word searching during conversations. As a result, Plaintiff reported limiting her social activities outside the home, which Plaintiff's wife confirmed in the third-party adult function report. Although it was quicker

to have accompaniment due to Plaintiff's forgetfulness, she could complete grocery shopping in store. She also reported the ability to pay attention for variable amounts of time depending on the task and distractions present; the ability to follow written instructions and short, spoken instructions well; and the ability to get along with authority figures well. (*Id.*).

As to the discounted medical source statements, the ALJ noted that Dr. Atchley and APN Revis (with Dr. Bennett) completed checklist forms asserting limitations not reported in the treatment record or letters offering conclusory statements that Plaintiff was unable to work. (ECF No. 15-2, pp. 24-25).

In January 2019, based on the October 2018 diagnostic evaluation from Stonehaven Behavioral Health, Dr. Atchley submitted a statement listing Plaintiff's diagnoses of PTSD, severe MDD, GAD, and panic disorder. (ECF No. 15-13, p. 39). Dr. Atchley listed symptoms including inability to relax, difficulty breathing, flushed face, low self-esteem, frequent crying, irritability, no interest in life, difficulty with decision-making, obsessive thoughts, heightened fears for safety of family, anhedonia, persistent replay of abuse, recurrent nightmares, and inability to get out of bed at times due to anergia. Dr. Atchley also submitted a checklist form asserting that Plaintiff had no useful ability to function on a sustained basis in almost any area necessary for work. (*Id.*).

Also, in January 2019, APN Revis, who had a three-year treating relationship with Plaintiff, submitted a statement asserting that, while Plaintiff had some physical limitations, she was more hindered by her cognitive deficits precipitated by her TBI. (ECF No. 15-13, p. 46). Based on poor short-term memory, decreased concentration, inability to complete tasks in a timely manner, easy confusion and distraction, and poor recall, APN Revis opined that Plaintiff would not be able to function in a work environment and that some environments would hinder her health. (*Id.*).

In his decision, the ALJ noted that the statements at issue were not supported by the

objective medial evidence or Plaintiff's own reported functionality. (ECF No. 15-2, pp. 24-25). Instead, they appeared to be based solely upon Plaintiff's subjective complaints. While APN Revis had a treating relationship with Plaintiff, the ALJ noted that conclusory statements regarding Plaintiff's ability to work or disability status are findings reserved to the Commissioner. (*Id.*). Thus, the ALJ did not err in discounting the opinions of Dr. Atchley and APN Revis as he provided good reasons for doing so.

While the ALJ did not find GAD, panic disorder, and PTSD to be severe impairments at Step Two, as discussed above, the ALJ clearly considered symptoms of these impairments in his assessment of Plaintiff's RFC. The objective medical and other evidence provide substantial support for the ALJ's mental RFC finding, as treatment providers noted improved symptoms with medications, examining physicians assessed generally normal to mild findings, and Plaintiff largely reported that medications were effective in abating her symptoms. Further, Plaintiff's subjective statements describing her activities of daily living also support the mental RFC finding, as she endorsed mostly independent activities of daily living, regular socializing, performing household chores, driving, shopping in stores independently, and taking her daughter to and from school.

Plaintiff did demonstrate limitations with memory, processing speed, and social anxiety, and, accordingly, the ALJ limited Plaintiff to work in which she would only engage in incidental interpersonal contact doing tasks learned and performed by rote with few variables, little judgment, and requiring simple, direct, and concrete supervision. While Plaintiff certainly experiences limitations due to her mental impairments, we cannot say that those limitations exceed those set out in the RFC finding. As such, we find that substantial evidence supports the ALJ's mental RFC finding.

### D.  VE Testimony

In her final issue, Plaintiff contends that the ALJ erred in his reliance upon the vocational expert's testimony because he failed to account for Plaintiff's pace limitations.  (ECF No. 18, pp. 17-18).  "The ALJ's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole."  *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011) (citing *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006)).

Here, the ALJ's hypothetical question included all the limitations found to exist by the ALJ and set forth in the ALJ's RFC determination.  As discussed above, the ALJ's RFC finding is consistent with the opinions of Dr. Walz and Dr. Kleiner, and properly does not include extreme limitations as set out in the opinions of Dr. Atchley and APN Revis.  Based on our previous conclusion that the ALJ's RFC findings were supported by substantial evidence, we find that the hypothetical question was proper, and the VE's answer constituted substantial evidence supporting the Commissioner's denial of benefits.

Accordingly, the undersigned finds that the ALJ's decision to deny benefits in this case is supported by substantial evidence.

### V.      Conclusion

Based on the foregoing, it is recommended that the ALJ's decision and the Commissioner's denial of benefits be affirmed, and that Plaintiff's Complaint (ECF No. 1) be dismissed with prejudice.

**The parties have fourteen (14) days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  We remind the parties**

**that objections must be both timely and specific to trigger de novo review by the district**

**court.**

DATED this 20th day of July 2021.

/s/Mark E. Ford

HONORABLE MARK E. FORD
UNITED STATES MAGISTRATE JUDGE